Robinson v. Illinois Farmers. Is that correct? Mr. Hack, is that right? That's correct, yes. You're up first. May it please the Court, Counsel. Good morning, Your Honors. It's good to be in your courtroom again, particularly on a beautiful day like today in Southern Illinois. Illinois Farmers respectfully request that the class certification order entered below be reversed and the case remanded for trial on Robinson's individual claims for breach of contract in violation of the Illinois Consumer Fraud Act. In certifying a class, the Circuit Court abused its discretion and committed a clear error of law. The predominant standard, the touchstone for class certification under our precedence, was not met and cannot be met. Under the Illinois Farmers Insurance Policy, under the case law in our State, questions of reasonableness and questions of standing. Does this named plaintiff have the ability to prosecute a claim for breach of contract? Are individual claims claims that must be tried with individual evidence? The Consumer Fraud Act claim, questions of deception, questions of proximate causation, those two are individual and demand individual evidence. The certification order I submitted at the bottom was a substantial injustice to the defendant. As contemplated by the Circuit Court, it seems that the defendant is barred from introducing any evidence that is material to a jury's thoughtful evaluation of whether the plaintiff's claims are reasonable, whether her charges are reasonable, and whether the charges of other members of this alleged class are reasonable. I submit that the flaws in the order cannot be cured by pretending that each and every individual issue in the case is purely one of damages or purely one suited for an ancillary process, a hypothetical one, about with uncertain standards, with no identification of the issues that will be relegated to this ancillary proceeding. And the fact that one is needed at all is a demonstration that there really is no efficiency. The benefits of the class action here don't really pertain because the questions are necessarily individual. Let me ask you this. Yes, sir. The only issue in this case is the reasonable, not only, but the issue is reasonableness of the bill. There's not an issue with regards to whether they're medically necessary or a proximate cause issue, is there? Just so I answer the right question. Yeah. On the causation issue, I don't dispute that the injuries were caused by an accident. Right. I do dispute there's no proximate cause that can be proven with common evidence under ICFA, but that's a different question. I just want to be sure I got it. Well, is it an issue in this case? I mean, you made payments in this case. You didn't deny that there was a medical necessity for the charge. You just contest it's not you paid the reasonable amount. Your Honor, there may be individual cases across the entire class where, upon close examination, there might be an instance where one would learn through discovery that, in fact, the service wasn't medically necessary. Why would you pay then? Pardon? Why would you pay? Well, Your Honor, we could have been mistaken. All I'm saying is we don't make that claim with respect to the treatments of Plaintiff Robinson. We don't deny the treatments were medically necessary. I'm only saying I can't give an answer across the alleged class. I can't say what the evidence will be across the entirety of that universe. Well, if they limit it to a class of people where it's not an issue as to whether it was medically necessary, then it wouldn't be, I take it. The class could be defined that way. For this one in a million you don't know about right now, he could be excluded and you could have a class. Your Honor, just to be clear, I don't believe a class can be properly certified here under any theory. But we don't make an argument about medical necessity today. I wanted to be sure. When you used the word proximate cause earlier, I just wanted to be sure we weren't in that game, that ballpark. Your Honor, focusing only there on the ICFA cause of action. That's the only reference I intended to make. Got it. Let me turn to the facts of it, some of which the Court is familiar with from our prior discussions. The policy promised here is to pay reasonable expenses. There's a further definition of what's usual and customary. An insurer was injured. He was insured by Illinois Farms. He was treated by the plaintiff, Dawn Robinson. Robinson's office called Farmers and asked, does this person have coverage? She never made any inquiry. Her office made no inquiry about the policy language. And that's important because the theory here is that there's some breach of the policy language. And under the ICFA claim, there's a claim there was a deception. The policy language is deceptive. But there was no communication with this plaintiff about that subject. Zerk identified a few charges that it thought were above the 90th percentile. It made a recommendation to Farmers that those charges be limited, the payment be reduced modestly. Farmers, in fact, then looked at those charges. A claim representative reviewed them and made a decision to pay. Farmers paid 97 percent of what Dawn Robinson billed, 97 percent. Issued today is $64 out of $2,200 that they identified as excessive. Dawn Robinson typically accepts far less than what Illinois Farmers paid. The testimony is over 60 percent of her payments are reduced by amounts between 9 and 56 percent off. That's at C01311 in the record. That's a record fact. There's also evidence, and we've submitted evidence, about charges comparing Dawn Robinson, your plaintiff in this case, to the plaintiff that we'll see in the next case, the Comichet case. Their chiropractic offices are, in round numbers, five miles apart. I've driven by both of them. They charge vastly different rates. They're only five miles apart. Vastly different rates for medical services. For example, x-rays, Comichet, $50. Robinson, $100. A different x-ray. Comichet, $50. Robinson, $200. I mention that because it demonstrates that medical charges vary. They vary dramatically amongst and between providers. They vary by community. And what's reasonable in one, the evidence is, may not necessarily be reasonable in the case of another. They presented no evidence how Dawn Robinson would prove her charges were reasonable. None, I submit. We did submit evidence that medical billing and payment practices, vary dramatically. Some of the evidence I just covered. We also submitted an expert affidavit which details this at length. That's in the record at 01289. We submitted surveys. We submitted desk books that are used by chiropractors to set rates. The one thing these show is dramatic and substantial variation amongst and between providers and what they believe is an appropriate medical expense. Can I ask you this? Please, Your Honor. Okay. You determine the amount of what a bill would be reasonable by saying every, is it 90th percentile, anybody that charges under the 90th percentile, that bill is reasonable? It was presumptively reasonable. Presumptively reasonable. SILVA did not recommend a reduction based on that. The Farmers' Bill Reviewer had discretion about what they would do. Okay. But we didn't exercise any of that in Robinson's case. We paid her bills in full. So you don't individually examine the doctor's bill and look at his overhead and determine it's reasonable. You use a statistical or a computer formula to come up with that number, 90 percent, 90 percentile, everybody below the 90th percentile. True, but not entirely true. Okay. What the recommendation is is just that. Zurb makes a recommendation about what Illinois farmers should pay. It uses its computer system to make, to provide that recommendation. The question is, though, what happens next? Robinson asserts to this court that. Before you get to the next, let me ask you this. The plaintiff says you've got to pay the amount we billed you. That's it. That's their theory. Okay. The full billed amount. Full billed amount, period, full stop. Okay. Now, if they took the position that we have our own expert who did his own survey and who did everything else and the reasonable out is 95 percentile, could they not proceed under that as a class action? As opposed to, here's my bill, pay it. No, I've looked at your numbers and it's 95 percent, so you've been underpaying us the 5 percentile. Not 5 percent, the 5 percentile. No for at least two reasons. Okay. Under the case law in our state, I'll start with Victory Memorial Hospital, which is from the Supreme Court of our state, and then there are three decisions from your sister appellate courts. There's Magic v. Stubblefield, there's Dreier Medical, and there's Sherman Hospital. These are three cases in which the courts look and apply what is a reasonable, what is a usual and customary medical expense. That's what the courts are looking at, and that's the policy promise, Robert. Our policy promise is to pay what is usual and customary. It's the same language these courts use, and the appellate authority and the Supreme Court authority is that question, is an individual question. You look at a whole range of things. If in a court of law you are going to argue and be the proponent of a claim that a medical charge is usual and customary, they list a whole series of factors. Okay. Let me just real quick. I know we only got so much time. I don't want to use it up on you. I can't understand why the plaintiff can't determine usual and customary the same way you do. Your Honor, there's a few reasons for that. First of all, I'll submit that we have a case authority about what is required of a plaintiff in a court of law. We know what the courts require. I would submit that this court itself uses the language of usual and customary. This court speaks in terms of that language. When you think about attorney's fees, it's the Krevit case. You would normally think that the plaintiff in a legal malpractice or misconduct case would have to come in and show what is usual and customary and reasonable. You would not. And they would do that by bringing a live witness in to testify. I've checked other cases after. I've checked other attorney fees and find out what other attorneys in this area normally charge for a divorce or whatever thing it is. And therefore, my opinion is in this case the reason necessary is X number of dollars. Your Honor, that would be a typical method of proof for a plaintiff and the defendant gets to contest it. Sure, sure. Now, if you have all that data in a computer program, wouldn't the computer program do just the same thing, only a heck of a lot quicker than a live witness coming in and testifying? If I say I've looked at what all the chiropractors in the area charge and the 90th percentile, here's the cutoff or the 80th percentile, isn't that the same thing that they're doing, only they're doing it quicker and electronically? Your Honor, you're leaping a little bit too quick, I submit, under the case law. The only thing you would know under that theory, I submit, is the only thing you would know is what is the distribution of charges in the community. That's the only fact you would know. They vary from $1, let's say, to $10. That's the only fact you would know. Under the case law, Victory Memorial and the other three cases I just cited, the legal requirement to prove what is usual and customary demands a far more intensive and extensive analysis. The case law says you have to look at, for example, the medical treatments. Are there anything unique in particular about the treatments, the service that's needed, the injury, anything unique in particular about your medical practice? The case would say you have to look at what do you accept as payment. What do you accept as payment for other providers? Do you accept, for example, as Ms. Robinson does, 60 percent of the time, less than her full bill of charges? Dr. Konishak's office manager testified he accepts less than full bill of charges essentially all the time. Somebody had to come in and put those figures in the program that Zurich used to ascertain. They didn't just pop up. Somebody had to go out and ask. The only thing you know, Your Honor, is the amount billed. It's the only thing you know. It's the only fact you know. And you know the service provided, the x-ray, the MRI, the adjustment. Well, it's all the information on the claim. Yes, that's true, too. But what's the difference between that and a live witness coming in saying, I've checked in Jefferson County here, and the last 10 divorces were uncontested divorces were charged at a rate of between $750 and $1,200. Therefore, I think that in this particular case, it's a reasonable attorney's fees to charge $1,000. What's the difference in that? Well, Your Honor, I submit there's actually a real important difference, which is when you look at the case law and what's reasonable and necessary under Illinois law, it says essentially it's a fact question. The jury has to evaluate a whole totality of evidence. It can't rely on just one factor. Remember, we're being accused of something in a court of law, and the possibility is a jury finding us to have breached our contract. We're entitled to contest that, whatever showing they make. We're entitled to contest it with evidence that the plaintiff's theory isn't true and should not be believed. So it may be that you can look at a computer program, and the computer will give you a distribution of charges in the community. That's not the only factor the cases say that you can look at. In fact, the cases mandate a much broader look, and that's our argument. Our argument is consistent with the case law. Any fair trial of this, any fair trial of these claims, the contract claim that comports with due process, must address the individual factors which the Supreme Court, which the case law in our state, and I submit, Your Honor, the great weight of authority from elsewhere. We've referred you and directed the court and invite the court to look at the advanced acupuncture case from the federal court in New Jersey or to look at, very recently, the Farmer's Insurance Exchange case out of California where the court said, look, it may be that you have a computer process, but that doesn't answer the threshold questions of reasonableness. All that tells you is what's the distribution of charges in a community? A greater analysis is required. We've provided the court the Masterson opinion. That's a trial court decision from Cook County I know you typically don't look at. I'd invite you to look at that. It addresses this question about whether the process argument is the beginning and the end of the class certification analysis. I submit the better analysis, the better authority, the more persuasive authority, explains why reasonableness is a fact-intensive individual question. I submit it's very much like Avery. Judge Stone, very much like Avery. In Avery, the promise was fact-specific, to return the card to pre-loss condition. That was the promise. The court said determining whether that promise was satisfied requires individual evidence and fact-finding. What was the card's condition before? What was the card condition afterwards? Is it different? It requires evidence. It may require testimony. It may require documents. What it can't be, it can't be certified into class because it can't be proven with common evidence. That's our argument here about the reasonableness problem. Time is moving. I'm going to move ahead a fair bit to standard issues. A plaintiff stands before you as an assinee of the insurance policy. And at their brief, they say, and I quote, that their claims are premised as they are on harms allegedly suffered by the assenors. I'm going to say that again. Harms suffered by the assenors. Question. What does the individual evidence show about harm to the assenor in this case? The assenor here is Mr. Tim Nesbitt. He was an Illinois Farmers Insurance. He was treated by Dawn Robinson's clinic. Was he harmed? She never sent him a bill. He never paid a bill. He's under no threat of balance bill. She doesn't send bills to patients for amounts that are not covered by insurance. So there's no harm to this insured whatsoever. We had the former director of the Illinois Department of Insurance look through some claim files. In fact, he looked through over 200 of them to see in the alleged class, is there evidence that other insureds were harmed? You can't tell without looking at files. But in the 200 plus files he looked at, he didn't see any insured suffering any injury because of the RC40 reduction about which Dawn Robinson complained. And that's important. It's important because in addition to the reasons that I addressed earlier about reasonableness, why you can't certify the contract claim, you also can't certify the contract claim because questions of assignment, of standing, whether this plaintiff, Ms. Robinson, or any other plaintiff in the class has standing to bring a suit, is itself an individual question. Is there harm to the ass and all? There isn't here. I'm going to go back, Judge Donovan. I'm going to move backwards to something that you've inquired about, about the automated process. And I neglected to raise it, but it came to me now. The evidence, Robinson asserts in her brief that there was a uniform policy of following the Zerg recommendation in each and every occasion. You'll find that at, I think it's page 12 of their brief. The evidence is the opposite. And I direct the court to see 01195 to 99. Donovan Robinson only talks about one insurer who she treated, who's an Illinois Farmers insurer, but she treated two. You don't hear about the second one. I brought the second one, and I had to do it for a reason. She doesn't want to talk about it because, in fact, in the second example, Zerg identified a number of charges that it thought were excessive. Her bills in round numbers, around $4,800. The RC40 recommendations in round numbers, $500. The Farmers claim representative looked at that claim and overrode each and every one of those recommendations, didn't follow the Zerg recommendation. So when you hear that it's all uniform, everything's the same, the evidence in this named plaintiff's case is vastly different. This named plaintiff's case disproves the argument that the computer process is the be-all and end-all, that it is the dispositive answer to all questions. Let me turn to the AP claim. Then you would exclude from the class any cases in which you would limit it to cases in which they followed the Zerg recommendation and eliminate that individual disparity. You narrow your class. Your Honor, but my point is somewhat different. My point is every single bill reviewed is reviewed by a person, and that person had a reason for excluding it, for determining that it was excessive, that it need not be paid, that it was unreasonable. We're entitled to let the jury hear that explanation. I can't read your name here. Richard Burke. Okay. Good morning, Your Honor. It's always pleasant to be back here. I don't get to come down enough, I don't think, although it seems like I was here a few months ago. I'd like to start off with the fact that I believe the defendant's defense, essentially, is to simply rewrite the plaintiff's complaint. They allege that the breach that we allege is the failure to pay reasonable medical bills, but that isn't the breach that we allege. The policy requires the customer, and we went through this in the deposition, and it's in the deposition, it's clearly laid out in the brief. The policy tells the consumer what their duties are. Quote, what to do in case of an accident. And there's provide notice. And under the MedPay provision, and this is a very, very narrow class, it's one type of coverage that has a specific premium related to it, and there's one type of computer analysis with a specific code, the RC40 code. So this is a profoundly narrow class. It says to get your policy MedPay coverage, all you have to do is, if claiming MedPay coverage, submit all receipts for medical bills and expenses no later than 60 days from the day of the treatment. The defendant, then, assumes the burden of determining reasonableness. The plaintiff, the insured, never has to establish any evidence of reasonableness to get his bills paid. He simply has to establish that he's inside the terms of the policy. This is classic insurance law in the state of Illinois and most everywhere else. All the insured must do is determine that he is inside the terms of the policy, and once there's a limitation imposed on his benefits, that limitation shifts the defendant. Okay, just to make it easy on us now, assumes the burden of proof, are you relying on a term of the policy or a specific case or a specific regulation? Term of the policy. And what term of the policy is that in? Determination of coverage. It's at C00301. And what does it say, if you have it there? Or you can just paraphrase it. Yes, it says, at our expense, we may employ or enter into contract with an independent medical consultant to assist us in determining whether all or any portion of the claim is for a reasonable expense or necessary services. We submit to such consultant any medical records bills and any other documentation we deem appropriate. In other words, they have assumed that they are the ones that are going to determine the limitation of the benefit, and that is the provision that we claim is breached because the means by which they do that are not consistent with policy terms. But that's the provision you believe shifts the burden of proof in a breach of contract action. Absolutely. The contract itself, we believe, shifts. Because once we establish the things that we are supposed to do, which is, yes, we're an insured vehicle, we're in an accident, we had medical expenses, we are a MedPay recipient, we paid our premium and we had the coverage. Okay? They then turn around and impose the limitation, which is what this case is about. Is there a case at this time that supports your argument? Is there a case you can refer us to that supports your argument? Oh, well, sure. They're quoted in the brief. There's the Aspen case, the Stonebridge case. There's a lot of cases on the burden of proof in an insurance policy and what the insured must establish. There's some other interesting cases on health coverage, because this really comes up a lot in health coverage. There's the Van Vactor case, which is a class action which dealt with medical necessity, and there's the Carroll case, which also dealt with medical necessity. In those cases, both dealing with medical necessity, the question was, is there a predominant common question about which all class members have a community of interest, such that the resolution of that question establishes a right of liability under the claim? Okay? Now, Avery, which articulated that same community of interest standard as a successful adjudication standard, doesn't change the law, and the court said it didn't change the law. So what is the predominant legal question for which each class member has a commonality of interest? And the answer to that is whether or not the RC40 determination, excluding or limiting coverage, is consistent with the terms of the policy. Now, the defendant likes to see, and it's omnipresent in the brief, as to what their statistical analysis does. But that's what the lawsuit is about. That's what the trial is about. We say they don't do that. In fact, the policy says that the determination of reasonable or reciprocally unreasonable is usual and customary for necessary medical services in the county in which the services are provided. Now, one would assume that what the defendant is doing is taking all the bills for this treatment from similar doctors in this county and determining what's the usual and customary treatment. Except that's not what the machine does. It doesn't do it in the farmer's case, and it doesn't do it for any other vendor that they've hired. For starters, to be truthful, farmers doesn't have any idea what it does. We've deposed their people, and they haven't got a clue. They have no idea where the data comes from that's analyzed. They have no idea how the data was analyzed. They have no idea what percentage of any of that data came from St. Clair County or any other county in the state of Illinois. They don't even know if it was limited to the state of Illinois. Because remember, all the adjusting has been vented out. The argument they want to make that there's an individual review has simply been established as being candidly absurd. They hired a computer system, ZURB, Bill Review, which they call Bill Repricing, interestingly enough, who then licenses a database analysis company called MedData. So what is the analysis that MedData is doing? MedData is mathematically modeling the data. They don't look at light services in the county of St. Clair, Illinois, or any other county. They group data according to what they call the PRSO, a sociodemographic profile. Did you have an expert dispute at ZURB's analysis of what was done? Well, we used their own experts to do it, and we used their own witnesses. Yes, it's all in the record. This record is enormous. Just the one before this was 44 lives. And the answer to that is yes, their own witness testified. Doug Hetherington, who was their Federal Rules 36 person most knowledgeable, the designee of the Corporation 201, who said that he didn't know what was in the data, and he didn't know whether the data related to witnesses in St. Clair County, although he assumed that it did. But in simplest terms, the way you envision the trial in this case is you mark an exhibit, which is your client's bill, and you've carried your burden of proof. And now they must now come forward and show that their expert or metadata's data is valuable, and you simply cross-examine. Well, the question is whether or not metadata's analysis has established whether or not this is their $3 that they limited the benefits of. Okay? It was unreasonable. But they look at the usual customary charges within St. Clair County as the policy requires to determine that she exceeded that reasonable amount by $3. But I'm hung up on the procedure. Okay. You walk in, you hand the bill, it's $150. You know, nobody else charges more than $100, but you charge $150, you put it down there, that's reasonable, case over. Not exactly. That's not how I envision the trial, no. What else do you have to do? There'd be more than that. But in simplest, I don't know. Well, I guess, yes. Sure, in simplest terms. Big things for us. Right. Well, obviously we've got to put it in play. And so you've carried your burden, and we're going to switch the whole case over to metadata now, to the genuineness of there, and they've got to now go forward and prove that's valid. They have to establish that the method by which they reduced that bill, limited the benefits, was justified under policy. In other words, they have to prove the legitimacy under the policy of the exclusion. Can they? I, you know, I just wonder how you don't have to take on, in your case in chief, using your own expert or your own analysis of their data and say it's wrong and I should have been paid more. Sure. Well, I did say there would be more. Yes, what we anticipate, okay, is that we will establish that the metadata analysis under this definition of determination of coverage does not determine reasonableness as the policy defines it. You'll do that in your case in chief, and you'll carry that burden. Is that what you're saying? You'll carry the burden that they have breached the policy because their determination of coverage is flawed. But in these certification orders that the trial judges did, the central focus, it seems to be, in their orders is they say, here's the bill, it's reasonable, that's enough for me. And you don't make any other showing, or the judge doesn't acknowledge any other showing in these certification orders. Well, I can tell you what the record said. We're working off the order. Well, what the order said is that we satisfied our requirements for dollars. Now, the question is, does Judge O'Malley say too much, or does Judge O'Malley say too little? His order was a little thin. It was more than a little thin. It was extremely thin. And I've got to tell you, in the 30 years... We looked at whose yard of court it was, too. We didn't. Yeah, I didn't know either. To be honest with you, I wouldn't have heard what he said. But, you know, there's all the... Look, the trouble is if you either say too much or you say too little. Now, normally and frequently in a case, he could have said, motion granted. Now, does that mean that he is entitled to the same standard of abusive discretion looking at the record as a whole? Now, that's very little, and even less than he said. And he identified the class. And we know from this immense record that was presented to him that... These usual customer reason cases, they've been... They're all over the place. I mean, in class... Federal class actions from here to New York to California, they are very much, I would say, involved. And the reason they are is because of the manipulation by the insurance company of the statistical analysis. Mr. Hack likes to say that charges are varied. Well, that doesn't mean any of them are unreasonable. For starters, you have to understand that the data is clean. All right? These are not claims of a $10,000 aspirin. These are not claims of abuse. They're not claims of fraud. These are all excluded. So when that data... First of all, that data comes from the insurance companies themselves. They select what they want to send, and they clean it before they send it. Once it gets to med data, it's cleaned again. Cleaned meaning outliers are removed. To say it's a 90... All this is is the 90th percentile of an array of data that's been mathematically modeled. It doesn't establish that it's the usual and customary anywhere. There is no statistical definition of usual and customary. It is simply an array of data that farmers get to choose based on its litigation. But in our next case, were you on that one too? No, I'm not on that one. The order there excluded the ones above 90 percentile. Well, we actually looked at some of the records. Just as an example, this 90 percent, just how losery this is. When they put in their expert on his claim that this is a 90 percent array, it turns out that 46.8 percent of all doctors get a cut. How do you get from 46.8 to 90? If you move it to the 90 percentile, 10 percent of the doctors will take a cut. Okay? So there's a lot of ways to manipulate this data. And the truth of the matter is farmers didn't want to have adjusters anymore. Farmers wanted a computerized, automated system that reviewed every bill instantly. Anywhere in the United States, within seconds, they can compute that. Its adjusters are told not to deviate from that. Their actual overall percentage is minuscule. Okay? But they talk about, well, we individually review bills. Bologna. They're in Columbus, Ohio. The only tool that they are provided or allowed to use to determine reasonableness is the Zurich analysis. They're using the 90th percentile. In your case, Chief, in front of the jury, do you use 100 percent percentile? I believe we could use the 100th percentile of any month, any bit of data. And you would do that based just on the amount of the bill simply. Hey, look, if the ball's in the strike zone, I don't care if it's in the lower left, the middle, the top, the upper corner, or the right. Okay? The question is, can they use the term reasonableness as cost containment solely for the purpose of increasing their profits and never actually determine reasonableness whatsoever? They've never determined it. They may not have meant to, but it may be reasonable. It may never have been their intention to say it was reasonable, but everything 90 percent down may be reasonable, even if they didn't intend it to be. Judge, there is absolutely, let's put it this way. We know what the genesis of this program is because it was litigated. And when I say that the genesis of this program was because farmers lost $2 billion in the 1994 earthquake and wanted to bring back a billion, it's not because I made that up. It's because the North Dakota Commissioner of Insurance ruled that way. They also ruled that their adjusters were paying incentive pay on not going over that number and were reducing incentive pay if they did override it. This is the history of this program. So are we really talking about a good faith analysis? Certainly there's an implication of good faith if you assume the burden or an implied obligation of good faith to actually do an analysis for the purpose of determining reasonableness rather than to do analysis just to shave off $5 so it adds up to a billion. That's what the trial is going to be about. This case, the sufficiency of their methodology never gets reviewed other than a class act. You're attacking their common method to adjust claims. But a breach of contract turns on whether reasonable expenses were paid. So how do you... The breach of contract determines on whether or not their determination was according to the policy definition. MedData hasn't got any idea what the policy definition is. Their computer programs and their statistical algorithms have nothing to do with the policy requirements. This company said that we would determine reasonable and customary within St. Clair County. They didn't do it. And they didn't do it by $2, $3. Farmers' written policy and procedure was to not pay a penny more than that computer program. And we have documents all over the place on that. Stick to the program. When I asked their opponent, well, was $32 they paid out of $30? Was it $33 reasonable? No, not reasonable. Completely unreasonable. $32.50? Nope. Unreasonable. Okay? This is about shaving dollars and cents off of almost what? At least half of the doctors in the state of Illinois. Half of the doctors in the state of Illinois are excessively charging? I don't think so. Okay? But the question is, does this ever get heard? The only way to litigate this case on whether or not that determination obligation under the policy is intrigued, they are the ones that assume the obligation to determine reasonableness according to the policy. They are the ones that put it in their policy that this determination was going to be done by these, quote, outside consultants. Fine. But they still have to conform to the policy requirements. Let me ask you this. Simple thing. If we do not accept your premise that the amount billed is admissible to show reasonableness, and that is central to the trial court's determination of a class, what does that do to that certification? We're saying to determine reasonableness in a bill, normally it has to have been paid or you have to have testimony that it's reasonable, and that's the individual doctor. And we go that old route there. And we just say, you can't use that bill to prove reasonableness. And that, to me, is a linchpin of how they certify these classes. Those cases, the classic case, the linchpin case, Victor Memorial Hospital. Victor Memorial Hospital was in the absence of a contract. It was Quentin Merrill. Victor Memorial Hospital, which, by the way, it turned out that Victor Memorial did get its money because of willingness to accept that, yes, they were determining their own share. You know, how they determined the bill was reasonable was good enough. But this is a breach of contract claim. So the question then becomes, does the plaintiff have to do more? Does the plaintiff doctor have to come in and say, here's an affidavit, these are my bills, this is reasonable, and I checked with everybody else and this is what they understood? I mean, they certainly don't have to do it under this insurance policy. So the reason that the argument comes up that there has to be individual questions of reasonableness is because the defendant wants to change the breach from the one that the plaintiff has alleged. The plaintiff has alleged that within the terms of this policy, they simply have to prove that it's a covered act, which they admit. The only thing that this case is litigating is that shavings under the RC40 code. That's it. That's the only class that's been served. But it seems like you could prove reasonableness one of two ways. You could take the individual doctor and say, here's my overhead. This is what I've been charging for 30 years. Okay. Small claims case. Or you come in with your own expert and say, I've done this, I've got an expert in the medical billing field, got a Ph.D. in it. They're in every insurance company in the world right now. Medicare, Medicaid, everywhere else. And this is the reasonable amount of the bill. And then maybe you go with a class action. But I don't see anything in these certifications where you made any attempt to do that. Because if I do that, don't I have to do that for every class action? No, they don't do it. They don't. But there's no question. The defendant is not disputing the individual case. In other words, we're not at the stage of saying whether Robinson can prove the reasonableness or not prove the reasonableness of the bill. They're not even arguing that. They're not even seeing that. They're saying that whether Robinson proves her bill is reasonable does not prove the reasonableness of the other 20,000 healthcare providers in the state of Illinois. That's the successful adjudication standard. So that's their argument on class action. Okay. So if the argument is that we have to prove reasonableness of every bill, then obviously that's an individualized question and we get nowhere. All right? So the battle isn't on that one. The battle is whether or not the plaintiff has framed a breach of contract and consumer fraud case such that it only has to establish that common element to create a right of recovery in everybody else. The right of recovery that Robinson creates in everybody else is the method by which that RC40 code was put on those explanation of benefits to knock out $2, $5, $6, whatever, breached the contract. That that determination breached the contract because it didn't – the code doesn't apply the definition of reasonableness in the contract. Thank you, Counsel. The rebuttal. I agree, Your Honor. Judge Wexton put his finger on the heart of the issue here. He asked, isn't the policy promise – he asked words of substance. I don't pretend to be good enough to quote it exactly. But isn't the policy promise, the operative policy promise, whether reasonable expenses were paid under the insurance policy? Judge Donovan asked, well, they may have had a bad intent. I suppose they had a bad intent, but what if they got it right? What if they, in fact, paid reasonable expenses? Inadvertently, by accident. What do those two questions have in common? I submit that they answer the question of whether this case can be certified as a class action, and here's why. Because the insurance policy promise, the one that obligates us to pay money is the one that says we're obliged to pay usual and customary reasonable expenses. That's the burden that we've assumed by contract. We don't have any other burden. You can read the policy from top to bottom. There's nowhere in the policy that doesn't say we're going to use any particular kind of bill review methodology. And, indeed, the plaintiff concedes in his brief – I think it's at page 4 if my memory is right – where they say we concede that we're not saying they had to use any particular kind of process. We're not alleging that. If we didn't make a promise about what kind of system we were going to use, I submit it's impossible to breach the promise. But that's a merits question. You don't need to go there, but it suggests to you what the real question is here. The real question is whether or not reasonable expenses were paid. Now, his argument, Mr. Burks' argument, Robinson's argument is we bear the burden. You can read the policy provision he cited to you. I submit in plain English those words have nothing – nothing – to do with what the burden of proof is in the courtroom. Nothing at all. Now, he said that we're trying to rewrite his policy, and this goes to an argument he submitted to you in his papers, in Dawn Robinson's papers. The argument is we're in the mistress of our pleadings. We get to decide for the judge how you think about the class certification inquiry here. That's not the law. That's wrong. You should think about the class certification inquiry. I submit respectfully. By looking at the case law in Illinois, by looking at the insurance policy language in Illinois, by thinking about whether there's anything from the Department of Insurance that might bear on this. Those are the things that I submit should guide the court's analysis. And when you look at those three things here, the policy language uses usual and customary. We know from our case law that's fact-intensive analysis. That's what's required. The Department of Insurance tells people in consumer publications which are before the court, look, insurance companies pay to what they decide is usual and customary. If you think they made a mistake, submit more evidence because they're making a fact determination. Show them that there's something unique about your particular circumstances. That's our argument all along. These questions really are fact-intensive. They're individual. You've got to look at them closely. The burden of proof argument is a sideshow for a second reason. Even if the plaintiff is assumed for, if this is a plaintiff who claims to have no burden of proof, that's, I'm unfamiliar with that process. But even if you assume for some reason that Farmers inherited a burden of proof, we get to submit evidence. I get to contest whatever showing he makes. He puts out an expert. Farmers is entitled to contest what that expert says. And I might be entitled to contest it depending on what the expert says with individual evidence or testimony from individual doctors, that his theory or her theory is wrong, is incorrect, doesn't work. So I introduce individual evidence in my case sheet. And as I'm doing that, the one thing that's clear is the case can't be certified for class trial because questions about what's reasonable and necessary, what is usual and customary turn out to be in practical application individual. That's what our case law says. That's what the weight of authority from across the country says. I'd like to comment very briefly on the Consumer Fraud Act because we didn't get a chance to cover it earlier. In Avery and in a very recent Seventh Circuit case, Greenberger v. Geico, which was decided just in January, it's a 2011 West law 6208, 2011 West law 6208. The court is looking at whether you can maintain the consumer fraud cause of action by essentially alleging a breach of contract. And that's what you see here. The consumer fraud claim at bottom reduces to the simple allegation that Illinois farmers did not pay the benefits due under the insurance policy. Avery holds, in fact, it's the title of a section in Avery. May I finish that thought? Go ahead. We've got a lot of other cases. Avery says you can't maintain a consumer fraud in those circumstances. Gentlemen, thank you again for your arguments today and your briefs. We'll get back with you as soon as we've popped the can.